kaw

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| THE BENNINGTON STATE BANK,           ) <br> ) <br> Plaintiff,           ) <br> vs.                                                         ) <br> ) <br> ) <br> KAN-TEX CULINARY, L.L.C., et al.,        ) <br> ) <br> Defendants.         ) <br> _____) | Case No.  07-4021-JAR |

## MEMORANDUM AND ORDER

On December 17, 2008, the Court heard evidence on the remaining claim in this action. Defendants Kan-Tex Culinary, LLC, Kan-Tex Steakhouse, Incorporated, and Leonard H. Hammer, Jr. ("Kan-Tex Defendants") claim that plaintiff Bennington State Bank ("BSB") breached its duty of good faith and fair dealing by not providing permanent financing in accordance with their agreement. For the reasons detailed below, judgment is granted in plaintiff's favor.

**Findings of Facts**

Kan-Tex Defendants sought financing for the construction of a restaurant in Salina, Kansas. BSB drafted a commitment letter dated September 15, 2004, detailing that BSB would provide construction financing in the amount of $1,730,000.00. The letter outlined that BSB would provide the interim construction loan at an interest rate of 6.5% per annum for a period not to exceed 180 days from start of construction. The conditions of the construction loan were that: (1) South Central Kansas Economic Development District, Incorporated ("SCKEDD")

would provide a signed copy of the 504 Authorization; (2) the builder would provide evidence of builder's risk insurance with appropriate loss payable clauses; and (3) a construction loan agreement would be entered into specifying further terms and conditions that would comply with the standards of the Small business Association ("SBA"), as well as the bank.

The commitment letter also provided that after the construction of the restaurant, BSB would convert the construction loan into permanent financing of $1,027,000.00 with an interest rate of 2% over New York Prime for a period of fifteen to twenty years.  The conditions of that permanent financing were that: (1) the building would be completed according to plans; (2) all real estate taxes would be paid current; (3) hazard insurance would be provided; (4) the loan would be secured by a first lien; (5) the loan would be subject to SBA approval; and (6) the borrower would sign a commitment with the bank.

The SBA authorization commitment was issued on September 15, 2004, and an authorization for debenture guarantee was approved on September 27, 2004.  On November 18, 2004, Kan-Tex Defendants signed a Promissory Note ("Note") with a loan maturity date of August 17, 2005.  The Note shows a principal amount of $1,730,000.00 at an interest rate of 6.5% per annum.  It stated that "[b]orrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning December 17, 2004, with all subsequent interest payments to be due on the same day of each month after that . . . . [P]ayments will be applied first to any accrued unpaid interest; then to principal . . . . " It further provided: "INTEREST AFTER DEFAULT.  If lender declares Borrower's entire loan immediately due after a default, or upon final maturity, then the total sum due under the Note will bear interest from the date of acceleration or maturity at 9.500% per annum until paid."

In combination with the Note, Kan-Tex Defendants signed a Mortgage Agreement ("MA") whereby they pledged as collateral the property located at 200 Diamond Dr., Salina, Kansas ("the Property"). In addition to the MA, Kan-Tex Defendants executed a Security Agreement ("SA-1"), giving BSB a "[f]irst lien in all business assets wherever located . . . ." Additionally, Mr. Hammer executed an additional Security Agreement ("SA-2") along with an Assignment of Deposit Accounts, pledging as collateral two certificates of deposits ("COD") held with BSB totaling $150,000.00. The SA-2 provided for a right of setoff, stating that "Lender reserves a right of setoff in all Grantor's accounts with Lender . . . . Grantor authorizes Lender . . . to charge or setoff all sums owing on the indebtedness . . . and at Lender's option, to administratively freeze all such accounts . . . ." Finally, the Kan-Tex Defendants executed an Assignment of Rents, pledging as collateral all rents accumulated from the Property, and Mr. Hammer then signed a Commercial Guaranty, making him personally liable for the maximum amount of $1,730,000.00. On December 9, 2004, Hammer, on behalf of all the Kan-Tex Defendants, signed an assignment of life insurance.

While the construction of the restaurant proceeded, the restaurant was not completed according to schedule. By September 27, 2005, no interest payments were made on the Note, and BSB and Kan-Tex Defendants entered into an agreement to extend the maturity date of the Note from August 17, 2005 to November 17, 2005. The agreement provided that in consideration of a rate change to 7.5% per annum, BSB would extend the maturity date of the Note. By November 2005, the restaurant was open, but Kan-Tex Defendants had still not made any payment of interest or principal to BSB. Again on December 20, 2005, the maturity date of the Note was extended from November 17, 2005 to March 20, 2006 by agreement of the parties.

This agreement provided that the Kan-Tex Defendants would pay accrued interest on a monthly basis beginning on December 20, 2005, at a fixed rate of 8.25% for the entire loan.

Although no interest payments were made, the parties tried to complete the conditions for permanent financing. On March 2, 2006, Kan-Tex Defendants' attorney sent an e-mail to SCKEDD stating that Hammer would agree to the SBA financing if BSB would agree to release the CODs as collateral. On March 9, 2006, BSB agreed to do so when the SBA loan was funded and paid down on the construction loan, leaving $1,027,000.00 in permanent financing. BSB also sent a letter to SCKEDD, explaining that BSB did not know of any unremedied adverse changes to the financial condition of the Kan-Tex Defendants. The letter provided that Kan-Tex Defendants had used all the construction loan proceedsof $1,027,000.00, and that the SBA loan would pay down $730,000.00 of the Kan-Tex Defendants' obligation under the Note.

Subsequently, on June 13, 2006, BSB sent Kan-Tex Defendants a letter stating that the Note was in default and that if the Note was not paid completely BSB would proceed with foreclosure. The letter referenced the extension of the maturity date to March 20, 2006, and also that Kan-Tex Defendants had failed to make interest payments on the outstanding balance of Note. The letter also stated that the accounts held with BSB would be frozen that day. Accordingly, Kan-Tex Defendants' CODs were frozen. Kan-Tex Defendants had not obtained funding from SCKEDD by that time.

In response, Kan-Tex Defendants faxed a letter dated June 15, 2006, to BSB explaining that the SCKEDD loan had not closed because the SBA required a current environmental study be done on the property. The letter also requested documentation of BSB's right to freeze Kan-Tex Defendants' accounts. Later that same day, Kan-Tex Defendants faxed another letter to

4

BSB reiterating its desire to communicate in writing only. On June 15, 2006, BSB sent another letter to Kan-Tex Defendants, explaining that BSB had setoff $21,352.56 and $1,000.00 from the accounts held by Kan-Tex Defendants to pay accrued interest.

On June 16, 2006, BSB agreed to unfreeze the CODs . By that time, the amounts setoff had been withdrawn from the accounts, but later deposited back into the accounts. The freeze also caused certain pending checks drawn on the accounts to be dishonored. In a letter dated June 20, 2006, Kan-Tex Defendants requested that BSB provide written documentation of the amounts withdrawn and deposited back into the accounts held with BSB. The letter also stated that Kan-Tex Defendants would inform the SBA of the current transactions so that the SBA could determine if completing the loan was a viable option. Again, Kan-Tex Defendants had not, by that time, made any payments on the Note nor completed all the steps to obtain permanent financing.

In a letter dated July, 21, 2006, Kan-Tex Defendants asked that BSB release the CODs as collateral and that BSB provide assurance in writing that it did not intend to foreclose on the Note. The letter also requested that the insurance proceeds be deposited in Kan-Tex Defendants' account so that the restaurant could be repaired.[1] The letter stated that Kan-Tex Defendants would not go forward with the SBA funding until these issues were resolved. After July 21, 2006, the parties held a telephone conference to discuss the release of the CODs, the insurance proceeds, and completion of the SBA funding. In that meeting, Kan-Tex Defendants understood that the June 13, 2006, letter accelerating the Note was rescinded, that the CODs would be released as collateral, and that the insurance proceeds would be released once Kan-Tex

---

[1]Sometime during the summer, the restaurant had been damaged by a hail storm and the insurance company sent proceeds to the bank to hold in escrow for repairs.

Defendants provided a contract for services to repair the restaurant roof.

On July 31, 2006, BSB sent another letter to Kan-Tex Defendants. The letter detailed the long relationship between the parties, the additional extensions, and that no payment had been made since March 20, 2006, the final maturity date of the Note. The letter also indicated that Kan-Tex Defendants had not met all the obligations for funding, and that BSB would complete permanent financing when the Kan-Tex Defendants completed its obligations under the SBA loan and made interest payments on the Note. Additionally, BSB informed Kan-Tex Defendants that it had contacted the SBA and learned that Kan-Tex Defendants missed the opportunity to complete the SBA loan in August, and needed to complete the SBA requirements to obtain funding in September. In the letter, BSB relayed that its interest was to "get the loan renewed, the interest paid and the conditions of the SBA loan met so that we can fulfill the original agreement." It suggested that Kan-Tex Defendants complete the SBA requirements, and make the interest payments with the CODs and any amounts remaining would be released upon permanent financing. In regards to the insurance, BSB reiterated that it would only release the funds for the roof repairs once completed or at a minimum while in the process.

On August 2, 2006, Kan-Tex Defendants demanded that BSB release the CODs held as collateral, claiming that BSB had no basis to hold those funds. Kan-Tex Defendants conditioned any continued effort to obtain the SBA funding on the release of the CODs. In response, BSB stated that it would not release the CODs because they were collateral under its SA-2. BSB again suggested that Kan-Tex Defendants could pay the interest from the CODs and complete the SBA obligations so that permanent financing could be finalized. After that, BSB would release any remaining amounts on the CODs. BSB stated that if Kan-Tex Defendants finalized

the SBA loan, their interest would be lowered, their obligation with the bank would be reduced, and the CODS would be released.

On August 18, 2006, Kan-Tex Defendants submitted the final requirements to obtain SBA funding. That same day, they also sent a letter to BSB informing it that they had completed their obligations to obtain SBA funding and again demanding that the CODs be released. Kan-Tex Defendants also requested the insurance proceeds to repair the roof as well as documentation of BSB's right to hold the CODs as collateral. On September 7, 2006, BSB informed Kan-Tex Defendants that it would release the CODs when SBA funding was received in October 2006, and when interest in the amount of $123,686.23 was paid. The letter further reiterated that the CODs could be used to pay the interest amount. In response, Kan-Tex Defendants told BSB that they were not agreeing to the renewal of the loan, but that they would consider BSB's proposal. Kan-Tex Defendants also told BSB that if the CODs were not released as collateral and the insurance proceeds not furnished within ten days, they would call the SBA and prevent completion of the SBA funding process. In addition, Kan-Tex Defendants threatened suit based on the alleged appropriation of the CODs. They did not dispute the amount of the accrued interest at that time.

BSB told Kan-Tex Defendants that the CODs were held as collateral until the SBA funding and the interest on the Note was paid. It provided the SA-2 to confirm its prior agreements. It also noted that no insurance proceeds could be provided to Kan-Tex Defendants until they followed the required procedures because BSB was in a fiduciary relationship with the SBA. If the SBA would approve of the funds being released before the repairs were complete, BSB would act accordingly.

On October 11, 2006, the SBA loan was finally funded. The entire amount was used to pay down the principal balance, bringing the remaining balance on the Note to $1,027,000.00. Kan-Tex Defendants did not object to the amount of the accrued interest or that the SBA funding was used to pay down the principal on the Note. The interest was still not paid; thus, on November 3, 2006, BSB sent a letter to Kan-Tex Defendants providing that all accrued interest must be paid at the time the renewal promissory note is signed. BSB again stated that Kan-Tex Defendants could pay the interest with the CODs, and offered Kan-Tex Defendants a lower interest rate on the long-term permanent financing. BSB also told Kan-Tex Defendants that in order to complete the financing they would have to make current the life insurance policy held as collateral on the Note.

In a followup letter on November 16, 2006, Kan-Tex Defendants made a counter offer, requesting that BSB provide additional financing for a hotel in Salina. The letter also wanted to make clear that Kan-Tex Defendants were never in default. On November 22, 2006, BSB sent a letter to Kan-Tex Defendants explaining that if they did not pay the interest and sign the new note by December 1, 2006, BSB would not honor the lower interest rate. That same letter also stated that the accrued interest on the Note was $138,718.84 and that after December 1, 2006, if the renewal note is not completed, BSB would apply the CODs to interest and any remaining to principal. BSB declined the counter offer to finance the hotel. Kan-Tex Defendants did not object to BSB's interest rate calculation. On December 7, 2006, BSB applied the CODs to the interest and then to principal. On January 10, 2007, BSB filed its foreclosure action against Kan-Tex Defendants in Saline County Court.

The proceedings culminated in a trial to the Court. At trial, Kan-Tex Defendants

presented evidence that the interest rate accrual was incorrect. This was the first time BSB was apprised that Kan-Tex Defendants claimed that the accrued interest was incorrectly calculated. But BSB acknowledged that the interest rate calculation was incorrect based on the maturity extension agreements. The evidence shows that even though the parties agreed on an interest rate of 7.5% in the September extension agreement, the automatic default rate at the bank was already accruing interest on the Note at 9.5%, the default rate on the Note. That rate continued until the March extension agreement. At no time during the year 2006 did Kan-Tex Defendants object to the interest rate. BSB management was not aware of the interest rate mishap.

**Discussion**

The issue presented is whether BSB breached its implied duty of good faith and fair dealing by failing to provide long-term financing as required by the commitment letter.[2] Kansas law imposes a covenant of good faith and fair dealing on every contract.[3] Essentially, parties to a contract shall not "'intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"[4] The Kansas Supreme Court has expressed that "the test for good faith is subjective and requires only honesty in fact."[5] Kan-Tex Defendants must show that BSB was dishonest in accelerating the Note and foreclosing

---

[2] In defendants' trial brief they only address one claim—breach of good faith and fair dealing in completing permanent financing. Accordingly, the Court will presume that defendants have abandoned its claim for breach of good faith and fair dealing based on the setoffs to the accounts held with BSB.

[3] *Daniels v. Army Nat'l Bank*, 822 P.2d 39, 43 (Kan. 1991).

[4] *Id.* (quoting *Bonanza, Inc. v. McLean*, 747 P.2d 792, 801 (Kan. 1987)).

[5] *Id.* (citing *Karner v. Willis*, 710 P.2d 21, 23 (Kan. 1985)).

on the Property for Kan-Tex Defendants' failure to pay the interest on the Note.[6]

Kan-Tex Defendants argue that BSB agreed to provide permanent financing upon completion of certain conditions, and when Kan-Tex Defendants completed those conditions, BSB failed to provide a promissory note for permanent financing. BSB refutes this contention, arguing that the Note on the construction loan was in default and that it could exercise its right to foreclose at anytime. Under those circumstances, it was not obligated to move forward with the permanent financing.

Specifically, Kan-Tex Defendants argue that prior to acceleration of the Note, they were in compliance with the conditions required for BSB to provide permanent financing as agreed. That contention is incorrect. The commitment letter for the construction loan provided, among other things, that a construction loan agreement would be entered into specifying further terms and conditions that will comply with the standards of the SBA, as well as the bank. Those further terms and conditions were in the Note, which provided for monthly payments beginning shortly after execution of the Note. In this instance, Kan-Tex Defendants failed to meet their obligations under the Note even after a number of extensions and warnings. Moreover, BSB repeatedly advised Kan-Tex Defendants that they were required to pay the accrued interest on the Note before any permanent financing would be finalized.

Kan-Tex Defendants argue that making the interest payments was not a part of the agreement for obtaining permanent financing. The Court disagrees. Here, the commitment letter served as the outline for the entire agreement. It provided the conditions for the construction loan and for the permanent financing. In addition, it provided that additional terms and

---

[6]*Gillwater v. Mid-America Bank & Trust Co.*, 870 P.2d 700, 704 (Kan. Ct. App. 1994).

conditions were going to be in the documents signed for the loans themselves. Those terms provided for payments, which Kan-Tex Defendants can hardly argue were not required as they routinely signed extension agreements to make those payments. In any event, even construing the commitment letter as the initial agreement, the parties signed a subsequent agreement that provided additional terms.[7]

Another argument implicit in Kan-Tex Defendants contentions is that BSB did not accelerate the Note until after all the conditions were met even though it was in default. But, as BSB states, it can exercise its right at any time when the power is available.[8] Here, there can be no argument that Kan-Tex Defendants were not in default at the time BSB exercised its right to foreclose and setoff the CODs. The fact is that the Note was in default after March 20, 2006. There is some indication that Kan-Tex Defendants wanted assurance that the Note was not technically in default, but there was never an additional extension agreement signed nor any evidence that BSB represented that the Note was not in default. On numerous occasions, BSB warned Kan-Tex Defendants that they were required to pay the accrued interest on the Note. They were told how they could pay the interest and that no permanent financing would take place until it was paid. There can be no argument that BSB acted in bad faith when it told Kan-Tex Defendants numerous times that the interest accumulated on the Note was due.

Kan-Tex Defendants also argue that the Note was called solely because they did not choose the options provided by BSB. This contention is also incorrect. For when given the

---

[7]"[A] court may ascertain the existence and terms of an agreement from a combination of written instruments and acts of the parties in connection therewith." *Ed Bozarth Chevrolet, Inc. v. Black*, 96 P.23d 272, 276 (Kan. Ct. App. 2003).

[8]*See Riley State Bank v. Spillman*, 750 P.2d 1024, 1028 (Kan. 1988) (stating that the "[b]ank's tolerance of late payments did not waive its right to claim a default in the future.").

option of a lower rate of interest, Kan-Tex Defendants still failed to complete the requirements for consummating the permanent financing.  Instead, Kan-Tex Defendants made a counter offer, requesting that BSB provide additional financing for another project.  If Kan-Tex Defendants decided to make the interest payments and then complete the documents for permanent financing for the Property, they would have had permanent financing.  Rather, they decided to make a counter offer, similar to their repeated efforts, throughout the course of negotiations, to change the agreement by obtaining a release of the CODs.  Under these circumstances, Kan-Tex Defendants actually breached the agreement by making a counter offer and by not meeting all their obligations under the Note.

Finally, there is some issue as to the amount of accrued interest on the Note.  BSB admits that the interest accrued at a higher rate of 9.5% from August 2005 to March 2006 when it should have accrued at 7.5%.  Kan-Tex Defendants have offered no evidence that BSB was dishonest; rather the evidence at trial revealed that it was merely a clerical error, which is easily correctable.  BSB should correct this rate, apply the CODs to interest, and apply any remaining amount to  principal.  Accordingly, BSB did not breach its duty of good faith and fair dealing by accelerating the Note and foregoing permanent financing with Kan-Tex Defendants.  Judgment is granted in favor of BSB.

**IT IS THEREFORE ORDERED THAT** Judgment is granted in favor of BSB.  Kan-Tex Defendants' Counterclaim is dismissed with prejudice.

**IT IS SO ORDERED.**

Dated:  March 25, 2009

              S/ Julie A. Robinson
             JULIE A. ROBINSON
             UNITED STATES DISTRICT JUDGE